## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STACY L. BUTLER,                    :        Civil No. 3:15-cv-598
                                    :
        Plaintiff           :        (Judge Mariani)
                                    :
        v.                  :
                                    :
KEVIN PIGOS,                        :
                                    :
        Defendant           :

**FILED**
**SCRANTON**

MAR 2 2 2016

Per_____
DEPUTY CLERK

### MEMORANDUM OPINION

Plaintiff, Stacy Butler, an inmate currently confined at the United States Penitentiary at Lewisburg, Pennsylvania, ("USP-Lewisburg"), commenced this *Bivens*[1], 28 U.S.C. § 1331, civil rights action on March 25, 2015. (Doc. 1). The named Defendant is Kevin Pigos, a medical doctor employed by USP-Lewisburg. (*Id.* at p. 2). Plaintiff alleges that Defendant Pigos was deliberately indifferent to his serious medical needs by denying him medical treatment and discontinuing his pain medication. (*Id.* at pp. 2-4).

Presently pending before the Court is Defendant Pigos' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 20). For the reasons set forth below, the Court will grant Defendant Pigos' motion.

---

[1]   *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

I.    **Standard of Review**

Summary judgment should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is "no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard

provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d

Cir. 1990).  A disputed fact is "material" if proof of its existence or nonexistence would affect

the outcome of the case under applicable substantive law.  *Id.*; *Gray v. York Newspapers,*

*Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and*

*Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  Once such a

showing has been made, the non-moving party must go beyond the pleadings with

2

affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

## II.    Statement of Undisputed Facts

With the above standard of review in mind, the following are the facts material to the

present motion, drawing all reasonable inferences in favor of the non-moving party, Butler.

At all times relevant, Defendant Pigos was the Clinical Director of USP-Lewisburg. (Doc. 21, ¶ 7; Doc. 21, Ex. 1, Declaration of Kevin Pigos ("Pigos Decl.") ¶ 2). As Clinical Director, Defendant Pigos supervises and approves all medical decisions made by the medical staff. (Doc. 21, ¶ 8; Pigos Decl. ¶ 2). Defendant Pigos has the final decision making authority in all decisions involving Butler's medical needs. (Doc. 21, ¶ 9; Pigos Decl. ¶ 2). However, the distribution and use of prescription medications in the prison is strictly monitored and controlled by medical staff to prevent any issues caused by misuse of medication. (Doc. 21, ¶ 10; Pigos Decl. ¶ 3).

The parties dispute whether Defendant Pigos ever personally examined Butler while Butler was housed in the Special Management Unit ("SMU") at USP-Lewisburg. (Doc. 21, ¶ 11; Pigos Decl. ¶ 4;Doc. 30, ¶¶ 2-13; Doc. 30, pp. 28-37).

On August 30, 2012, Butler submitted a sick call requesting "something stronger than [the] Motrin 600 mg" that he was already receiving. (Doc. 21, ¶ 12; Doc. 21, Ex. 1, Attach. A, p. 9). Butler's Motrin was continued, and he was advised to discuss his concerns at his next chronic care clinic. (Doc. 21, ¶ 13; Doc. 21, Ex. 1, Attach. A, p. 9).

On August 31, 2012, Butler was examined in health services with complaints of chronic lower extremity pain, difficulty walking, and "constant pain" down his leg that Motrin did not alleviate. (Doc. 21, ¶ 14; Doc. 21, Ex. 1, Attach. A, p. 12). The staff member

4

ordered an x-ray, prescribed Gabapentin for pain, and considered a referral to neurosurgery/orthopedic. (Doc. 21, ¶ 16; Doc. 21, Ex. 1, Attach. A, p. 13).

On August 31, 2012, Butler underwent an x-ray which was negative except for "orthopaedic hardware with suggestion of fracture of right pedicular screw at L5." (Doc. 21, ¶ 15; Doc. 21, Ex. 1, Attach. A, pp. 10-11).

On September 10, 2012, an envelope of medication was discovered during a search of Butler's cell. (Doc. 21, ¶ 17; Pigos Decl. ¶ 6; Doc. 21, Ex. 1, Attach. A, pp. 19-24). The contents of the envelope were identified as Gabapentin, a pill line restricted medication. (Doc. 21, ¶ 18; Pigos Decl. ¶ 6; Doc. 21, Ex. 1, Attach. A, pp. 19-24). The confiscated medication memorandum explained that Butler had a prescription for Gabapentin, and when the medication is delivered on the pill line, it is supposed to be ingested immediately in front of the staff member distributing the pills. (Doc. 21, Ex. 1, Attach. A, p. 19).

Following this incident, Butler's prescription for Gabapentin was discontinued for misuse of the medication. (Doc. 21, ¶ 19; Pigos Decl. ¶ 6; Doc. 21, Ex. 1, Attach. A, pp. 19-24). Butler avers that there is no evidence of record to establish his misuse of medication on September 10, 2012. (Doc. 30, ¶¶ 17, 26). Although the medication was found in Butler's cell, he states that he shared his cell with another inmate. (Doc. 30, ¶¶ 18-19).

On September 14, 2012, and October 9, 2012, Butler was provided medication refills of Ibuprofen 600mg to treat his back pain. (Doc. 21, ¶ 20; Doc. 21, Ex. 1, Attach. A, pp. 25-26).

On October 9, 2012, Butler requested a blood pressure check, but expressed no other medical concerns. (Doc. 21, ¶ 21; Doc. 21, Ex. 1, Attach. A, p. 27).

On October 26, 2012, Butler submitted a request for renewal of his Ibuprofen. (Doc. 21, ¶ 22; Doc. 21, Ex. 1, Attach. A, p. 28). Butler's prescription for Ibuprofen was renewed on the same day. (Doc. 21, ¶ 23; Doc. 21, Ex. 1, Attach. A, p. 28). On November 5, 2012, Butler's request for renewal of his Ibuprofen was again approved. (Doc. 21, ¶ 23; Doc. 21, Ex. 1, Attach. A, p. 29).

On November 22, 2012, Butler got into a cell fight. (Doc. 21, ¶ 24; Doc. 21, Ex. 1, Attach. A, pp. 30-37). When officers arrived at his cell, Butler refused to submit to hand restraints, and they had to subdue him with OC spray. (Id.). Butler was removed from his cell and decontaminated with water. (Doc. 21, ¶ 25; Doc. 21, Ex. 1, Attach. A, pp. 30-37). He showed no signs of distress, and was talking in full sentences. (Id.). Butler admits that he refused to cuff-up, but blames this refusal on his inability to move fast enough to comply with the officers' directives. (Doc. 30, ¶ 22). Butler suffered a shallow laceration to the outside of his right ear, with no other medical concerns or signs of trauma. (Doc. 21, ¶¶ 25, 27; Doc. 21, Ex. 1, Attach. A, pp. 30-37).

On November 27, 2012, Butler was seen by an outside medical provider to evaluate his complaints of low back pain and right leg pain and numbness.  (Doc. 21, ¶ 28; Doc. 21, Ex. 1, Attach. A, pp. 38-44).  The outside doctor indicated that there was a possible fracture of the right pedicle screw, and recommended an MRI and CT scan.  (Doc. 21, ¶ 29; Doc. 21, Ex. 1, Attach. A, p. 43).  On November 30, 2012, a prison doctor requested an MRI, CT scan, and x-rays.  (Doc. 21, ¶ 30; Doc. 21, Ex. 1, Attach. A, pp. 46-47).

On December 4, 2012, Butler's Ibuprofen was renewed.  (Doc. 21, ¶ 31; Doc. 21, Ex. 1, Attach. A, p. 48).

On December 13, 2012, a radiology test revealed orthopedic hardware with a suggestions of a fracture of the right pedicular screw at L5.  (Doc. 21, ¶ 32; Doc. 21, Ex. 1, Attach. A, p. 51).

On December 18, 2012, Butler requested a refill of his Motrin.  (Doc. 21, ¶ 33; Doc. 21, Ex. 1, Attach. A, p. 53).  The request was denied because he was not due for a refill. (*Id.*).

On December 30, 2012, health services ordered a metabolic profile.  (Doc. 21, ¶ 34; Doc. 21, Ex. 1, Attach. A, pp. 54-55).

On January 3, 2013, Butler requested a liver function and kidney function test.  (Doc. 21, Ex. 1, Attach. A, p. 56).

On January 6, 2013, Butler was treated at health services with complaints of chest

pain that resolved with Mylanta.  (Doc. 21, ¶ 35; Doc. 21, Ex. 1, Attach. A, pp. 58-60).  An EKG was performed and showed a normal sinus rhythm.  (*Id.*).

On January 8, 2013, Butler was prescribed medication for gastroesophageal reflux disease.  (Doc. 21, ¶ 36; Doc. 21, Ex. 1, Attach. A, p. 61).

On January 10, 2013, Butler underwent an MRI and CT scan which revealed that he had a fractured right screw at L5 and a herniation.  (Doc. 21, ¶ 37; Doc. 21, Ex. 1, Attach. A, pp. 62-67).

Butler acknowledges that he underwent x-rays, MRIs, and CT scans.  (Doc. 30, ¶ 26).

On January 30, 2013, Butler received a refill of his Ibuprofen.  (Doc. 21, ¶ 38; Doc. 21, Ex. 1, Attach. A, p. 76).

On February 14, 2013, Butler requested that medical staff check his blood pressure. (Doc. 21, ¶ 39; Doc. 21, Ex. 1, Attach. A, pp. 78- 79).  He reported no other medical concerns.  (*Id.*).  On February 14, 2013, Butler was submitted for a neurosurgery consultation.  (Doc. 21, ¶ 40; Doc. 21, Ex. 1, Attach. A, p. 80).  On April 12, 2013, medical staff ordered labs and an EKG.  (Doc. 21, ¶ 41; Doc. 21, Ex. 1, Attach. A, pp. 81-82).

On April 18, 2013, Butler was advised to stop taking any aspirin products due to his upcoming medical procedure.  (Doc. 21, ¶ 42; Doc. 21, Ex. 1, Attach. A, p. 83).

On April 25, 2013, Butler underwent lumbar back surgery at the Williamsport

Hospital. (Doc. 21, ¶ 43; Doc. 21, Ex. 1, Attach. A, pp. 84-93).

On April 29, 2013, health services staff updated Butler's medical status to allow restraints to be placed in the front for two (2) weeks due to his back surgery. (Doc. 21, ¶ 44; Doc. 21, Ex. 1, Attach. A, p. 96).

On April 30, 2013, health services examined Butler to check his post-surgery staples, and change his dressing. (Doc. 21, ¶ 45; Doc. 21, Ex. 1, Attach. A, pp. 98-102). Butler complained of shooting pain and tingling sensations in his right leg. (Doc. 21, ¶ 46; Doc. 21, Ex. 1, Attach. A, pp. 84-93).

On May 3, 2013, Butler's staples were removed and health services noted that his wound looked good with no signs of infection. (Doc. 21, ¶ 47; Doc. 21, Ex. 1, Attach. A, p. 103). On May 6, 2013 and May 8, 2013, Butler's wounds were again treated. (Doc. 21, ¶ 48; Doc. 21, Ex. 1, Attach. A, pp. 104-108). On May 10, 2013, Butler's dressing was changed, it was noted that he has a regular shower daily, and that he is able to walk slowly but with shooting pains in his leg. (Doc. 21, ¶ 49; Doc. 21, Ex. 1, Attach. A, p. 109). Butler disputes whether he was able to shower daily. (Doc. 30, ¶ 23).

On May 14, 2013, Butler requested a renewal of his front-cuff medical status. (Doc. 21, ¶ 50; Doc. 21, Ex. 1, Attach. A, p. 110). On May 14, 2013, the chronic care clinic treated Butler. (Doc. 21, ¶ 51; Doc. 21, Ex. 1, Attach. A, pp. 111-114). He reported that he was still experiencing some pain, but less pain than before the surgery. (Id.).

On May 17, 2013, Butler was evaluated by health services and complained of shooting pains in his right leg. (Doc. 21, ¶¶ 52-53; Pigos Decl. ¶ 7; Doc. 21, Ex. 1, Attach. A, pp. 115-117). It was noted that he was "ambulating very well in the cell slowly", and was prescribed Gabapentin. (Id.).

On June 13, 2013, Butler was treated by an outside doctor with continuing complaints of back and leg pain, and leg tingling. (Doc. 21, ¶ 54; Doc. 21, Ex. 1, Attach. A, pp. 120-129). Butler also reported that his pain had decreased post surgery. (Id.). The outside doctor requested additional films, and advised Butler to progress activity. (Doc. 21, ¶ 55; Doc. 21, Ex. 1, Attach. A, pp. 125, 130).

On June 14, 2013, Butler underwent radiology films of his back. (Doc. 21, ¶ 56; Doc. 21, Ex. 1, Attach. A, p. 132). The films revealed a right pedicular screw fracture at L5, and otherwise no acute fracture or dislocation. (Id.).

On August 31, 2013, a staff member from prison health services delivered Gabapentin to Butler in crushed form inside a pill packet. (Doc. 21, ¶ 57; Doc. 21, Ex. 1, Attach. A, pp. 134-135). Butler put an empty pill pouch in his mouth. (Id.). The staff member ordered him to take the medication, or return the pouch. (Id.). Butler took the full pouch from the door, but refused to return it to staff. (Id.). The staff member then informed Butler that his medication would be discontinued due to misuse. (Id.). Butler thereafter became belligerent. (Id.). Butler maintains that he never received a disciplinary sanction

for misusing pills.  (Doc. 30, ¶ 15).

On August 31, 2013, Butler's prescription for Gabapentin was discontinued for the second time due to misuse.  (Doc. 21, ¶ 61; Pigos Decl. ¶ 8; Doc. 21, Ex. 1, Attach. A, pp. 134-135; Doc. 21, Ex. 1, Attach. B).

Butler was sanctioned for misuse of the medication and failure to follow staff direction.  (Doc. 21, ¶ 62; Pigos Decl. ¶ 8; Doc. 21, Ex. 1, Attach. B).  The Unit Discipline Committee ("UDC") found that Butler committed prohibited act code 302, finding that he failed to take his medication properly when instructed.  (Doc. 21, Ex. 1, Attach. B).  Codes 307 and 298 were expunged from the report.  (*Id.*; Doc. 30, ¶ 16).

The Defendant asserts Butler's failure to follow BOP policies concerning the distribution of prescription medication was a serious offense.  (Doc. 21, ¶ 62; Pigos Decl. ¶ 9).  Further, Pigos contends that the decision to discontinue Butler's medication was warranted to ensure his safety, and the overall operation and safety of the institution.  (Doc. 21, ¶ 63; Pigos Decl. ¶ 9).

## III.   Discussion

A *Bivens* action is the federal counterpart to an action filed under 42 U.S.C. § 1983. *See Paton v. LaPrade*, 524 F.2d 82 (3d Cir.1975); *Farmer v. Carlson*, 685 F. Supp. 1335, 1338 (M.D.Pa. 1988).  Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  *See* 42 U.S.C. §

1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

A.    <u>Deliberate Indifference to Medical Needs</u>

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the

12

necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Mere negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *See Estelle*, 429 U.S. at 106; *Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004); *Monmouth Cty.*, 834 F.2d at 346.

Defendant Pigos argues that the record fails to support any claim that he acted with deliberate indifference to Butler's medical needs. (Doc. 22, at 6-9). The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse*, 182 F.3d at 197. The allegations in Butler's complaint, and the evidence of record, clearly demonstrate that Butler received medical attention while

13

incarcerated at USP-Lewisburg, and that the attention he received lacks indicia of the

requisite deliberate indifference to support a § 1983 claim.  The evidence reveals that during

the relevant time period, Butler received continuous care from prison health services and

outside medical providers, including various examinations, tests, and pain medication, as

briefly summarized below.  (Doc. 21, ¶¶ 28, 29, 37, 55, 56).

On August 31, 2012, Butler was examined by health services with complaints of

chronic lower extremity pain, difficulty walking, and "constant pain" down his leg.  (Doc. 21,

¶ 14; Doc. 21, Ex. 1, Attach. A, p. 12).  After the evaluation, Butler underwent an x-ray, he

was prescribed Gabapentin, and a referral to neurosurgeon/orthopaedist was considered.

(Doc. 21, ¶ 16; Doc. 21, Ex. 1, Attach. A, p. 13).

During a shakedown on September 10, 2012, an envelope of Gabapentin was

discovered in Butler's cell, and his prescription was discontinued for misuse of medication.

(Doc. 21, ¶¶ 17-19; Pigos Decl. ¶ 6; Doc. 21, Ex. 1, Attach. A, pp. 19-24).  Butler was

nevertheless provided alternate pain medication for his back pain, and received pain

medication refills on October 9, 2012, October 26, 2012, December 4, 2012, December 18,

2012, and January 30, 2013.  (Doc. 21, ¶¶ 20, 22, 23, 31, 33, 38).

On November 27, 2012, Butler was treated by an outside medical provider for his

back and leg pain.  (Doc. 21, ¶ 28; Doc. 21, Ex. 1, Attach. A, pp. 38-44).  On November 30,

2012, a prison doctor requested an MRI, CT scan, and x-rays.  (Doc. 21, ¶ 30; Doc. 21, Ex.

14

1, Attach. A, pp. 46-47).  On January 10, 2013, Butler underwent an MRI and CT scan. (Doc. 21, ¶ 37; Doc. 21, Ex. 1, Attach. A, pp. 62-67).

Butler continued to receive medical treatment from January through April 2013.  In April 2013, Butler underwent surgery to repair the broken orthopedic hardware in his back. (Doc. 21, ¶¶ 43, 45).  After Butler's back surgery, he complained of leg numbness and tingling, and medical staff again prescribed Gabapentin.  (Doc. 21, ¶¶ 52, 53).  On August 31, 2013, health services staff delivered Butler's Gabapentin in crushed form inside a pill packet.  (Doc. 21, ¶ 57).  Butler refused to properly take his medication and, as a result, his prescription for Gabapentin was discontinued for the second time due to misuse.  (Doc. 21, ¶¶ 57-61).

Notwithstanding this litany of medical treatment, Butler maintains that Defendant Pigos was deliberately indifferent to his medical needs by discontinuing his pain medication and denying and/or delaying his back surgery.  (Doc. 1; Doc. 28, at 6-10).  Butler's allegations, however, are not supported by the record.

Butler failed to present any evidence that his Gabapentin was discontinued for improper reasons.  He asserts that the medication was discontinued without his consent, and appears to lay the blame on his cellmate by inferring that the pills belonged to his cellmate.  However, Butler failed to overcome Defendant Pigos' competent evidence that his medication was discontinued twice due to misuse.  An inmate's "personal opinion about

15

what happened to him and why it happened is not competent evidence sufficient to defeat

[a] defendant's motion for summary judgment." *Davis v. Prison Health Servs., Inc.*, 558 F.

App'x 145, 149 (3d Cir. 2014).  Moreover, Butler was provided an alternate pain medication

when Gabapentin was discontinued.  Indeed, Butler acknowledges that he received pain

mediation.  (Doc. 30, ¶ 14).

The uncontroverted evidence reveals that during the time period between Butler's

first x-ray and his surgery, he received continuous care.  Butler acknowledges that he was

treated by the medical department and outside medical providers on numerous occasions,

and underwent x-rays, MRIs, and CT scans at the direction of Defendant Pigos.  (Doc. 30 ¶

26).

It is clear from the evidence of record that Butler's medical needs were attended to,

he received a significant level of care, and he is simply dissatisfied with the course of

treatment provided to him.  *See Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1024-35 (7th Cir.

1996) (inmate's disagreement with selection of medicine and therapy falls well short of

demonstrating deliberate indifference); *Czajka v. Caspari*, 995 F.2d 870, 871 (8th Cir. 1993)

(inmate's mere disagreement with doctor's informed decision to delay surgery does not

establish Eighth Amendment claim).

The Constitution does not guarantee a prisoner the treatment of his choice.  *Jackson*

*v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988).  The evidence reveals nothing more than Butler's

subjective disagreement with the treatment decisions of the medical staff. Claims of medical malpractice and disagreements as to the proper course of medical treatment will not satisfy the deliberate indifference standard. *Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d at 346. Additionally, courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Even if Butler's claims amounted to negligence, simple negligence cannot serve as a predicate to liability under § 1983. *Hudson v. Palmer*, 468 U.S. 517 (1984). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").

The evidence of record reveals only a dispute over the adequacy or appropriateness of the medical care. Based on the foregoing, Butler is unable to establish an Eighth Amendment deliberate indifference claim against Defendant Pigos, and summary judgment will be entered in favor of Defendant Pigos.

B.    Qualified Immunity

Defendant Pigos invokes the defense of qualified immunity in his summary judgment motion. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp*, 669 F.3d at 159 (citing Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325–26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first). Because there are no genuine dispute of material fact as to whether a constitutional or federal right has been violated, Defendant

Pigos' entitlement to qualified immunity presents an alternative basis for the grant of summary judgment to him.

## IV.    Conclusion

Based on the foregoing, Defendant Pigos' motion (Doc. 20) for summary judgment will be granted. An separate Order shall issue.

Date:  March 22, 2016

Robert D. Mariani
United States District Judge